**CONCERNED ABOUT TRIDENT et al.,**
**Plaintiffs,**

v.

**James R. SCHLESINGER et al.,**
**Defendants,**

**Pacific Legal Foundation, a nonprofit California Corporation, Defendant-Intervenor.**

**Civ. A. No. 74–1184.**

United States District Court,
District of Columbia.

Aug. 22, 1975.

David Sive, Mark A. Chertok, Richard Guy Leland, New York City, Philip M. Best, Bremerton, Wash., Ronald J. Wilson, Washington, D.C., for plaintiffs.

Irwin L. Schroeder, Geoffrey A. Mueller, Dept. of Justice, Lands Div., Richard C. Stearns, Dept. of the Navy, Washington, D.C., for defendants.

Raymond M. Momboisse, Ronald A. Zumbrun, Michael A. Lilly, Pacific Legal Foundation, Sacramento, Cal., and John H. Midlen, Jr., Washington, D.C., for defendant-intervenor.

## FINDINGS OF FACT

HART, District Judge.

1. This action was filed on August 5, 1974, as a suit for declaratory judgment and injunctive relief by five organizations and two individual plaintiffs against James R. Schlesinger, individually and as Secretary of Defense, and J. William Middendorf II, individually and as Secretary of the Navy.

2. The action alleges defendants' failure to comply with the requirements of the National Environmental Policy Act, P.L. 91–190, 83 Stat. 852, 42 U.S.C. § 4321 *et seq.* (hereinafter "NEPA"), as well as other federal statutes and regulations with respect to the development of the Navy's "Trident System."

3. Plaintiff, Concerned About Trident (CAT), is a non-profit corporation, formed with the purpose of taking any and all action, including the initiation of this lawsuit, necessary to prevent construction and operation of the proposed Trident support base at Bangor, Washington. Concerned About Trident has approximately 400 members, about 145 of whom live in Kitsap County, Washington.

CAT's activities have related primarily to the determination of defendants to place the dedicated site for the Trident Program at Bangor, Washington. Those activities included testimony and written comments before the Department of the Navy ("Navy") at hearings on the Trident Draft Environmental Impact Statement ("DEIS"), written comments on the DEIS, and providing speakers at various meetings of church, civic and environmental organizations.

4. Plaintiff, Hood Canal Environmental Council (HCEC), is a non-profit corporation formed in 1969 and interested in proper management of the natural resources of the Hood Canal and surrounding area. The Council has approximately 325 members, 165 of whom live in Kitsap County.

HCEC activities include the advocacy, development and implementation of environmental planning for the Hood Canal and adjacent land areas.

HCEC's activities have included study and analysis of the environmental and other effects of the decision to locate the dedicated site for the Trident System at Bangor. Those activities include testimony and written comments before the Department of the Navy at hearings on the DEIS, written comments on the DEIS and providing speakers at various meetings of church, civic and conservation organizations.

5. Plaintiff, Friends of the Earth (FOE), is a non-profit corporation organized in 1969 for the conservation and protection of the natural resources of the United States. FOE has more than 20,000 members throughout the United States, 36 of whom live in Kitsap County.

FOE's activities have included study of the environmental effects of the decision to locate the dedicated site for the Trident System at Bangor. These activities include testimony and written comments before the Department of the Navy at hearings on the DEIS, written comments on the DEIS, and providing speakers at various meetings of church, civic and environmental organizations.

6. Plaintiff, Washington Environmental Council (WEC), is a non-profit organization incorporated in 1969 with the purpose of securing environmental planning for the State of Washington. It has about 1,000 individual members, of whom about 50 live in Kitsap County, and about 60 corporate members, including CAT and HCEC.

WEC's primary activities include the taking of all steps necessary and proper to secure environmental statewide planning for the State of Washington. WEC also undertakes limited environmental planning activities outside the State of Washington.

7. Plaintiff, The Wilderness Society, is a national conservation society that was formed in 1935 for the conservation and protection of American wilderness.

It currently has about 70,000 members of whom approximately 750 live in Washington and 65 live in Kitsap County.

8. Plaintiff Walter Heller owns land in Kitsap County along the Hood Canal in the vicinity of the Bangor Annex in which he lives part-time.

Plaintiff Max Starcevich lives in property owned by his wife in Kitsap County along the Hood Canal.

9. Defendant James R. Schlesinger, presently is and was Secretary of Defense and an officer of the United States at the time this action was filed. As such, he exercises administrative supervision over the entire Department of Defense, including the Department of the Navy, its officers, agents and employees.

10. Defendant J. William Middendorf II, presently is and was Secretary of the Navy when this action was filed and is responsible to the Secretary of Defense for the conduct of the official business of the Department of the Navy.

11. Defendant-Intervenor Pacific Legal Foundation is a non-profit legal corporation duly organized and existing under the laws of the State of California for the purpose of engaging in matters affecting the public interest.

12. Defendants have determined to locate the Support Site for the Trident Program at Bangor, Washington. This site, described throughout these Findings as the dedicated site, occupies approximately 7,000 acres on the Hood Canal in the Puget Sound Basin, Kitsap County, in the State of Washington. The facilities required by this site include buildings, piers, transportation, communications, power and water supply systems, and waste disposal systems. During its operation, the site will directly employ no less than 4,400 military personnel and 3,500 civilians. Placement of the site at Bangor will result in an increase of approximately 30,000 persons to the present population of Kitsap County and surrounding areas.

13. Kitsap County is situated on the Kitsap Peninsula in the Puget Sound Basin. The County is set between the Olympic and Cascade Mountain Ranges in northwestern Washington. The County, as of 1970, had a population of approximately 102,000, with a population density of 259 persons per square mile. The County, except for one small city, Bremerton, can be characterized as semi-rural.

14. The general comprehensive development plan currently utilized by the County reflects a general policy to direct growth to areas adjacent to the existing urban centers while maintaining the primarily semi-rural character of Kitsap County.

15. Kitsap County is bounded on the west by the Hood Canal. The Hood Canal is a salt water body, on the west shore of which are the Olympic Peninsula and the Olympic Mountains. The mountains rise precipitously to their summits from the shores of the Canal. The natural beauty of Kitsap County has been throughout its history and is now a significant factor in the shaping of the lives and life styles of people residing in it. Many of the total number of people residing in Kitsap County have gone there because of the unique location and natural beauty of the County and the life style which stems therefrom.

16. In or about 1960, the Navy commenced deployment of a Nuclear Submarine Launch Ballistic Missile System, denominated the Polaris System, which consisted of the Polaris submarine and various missiles used in conjunction with the vessel.

17. Subsequently, defendants developed the Poseidon missile for use with the Polaris submarine. As of mid-1973, the Polaris/Poseidon System consisted of 41 nuclear powered submarines, each containing 16 missiles.

18. Beginning in 1966, the Secretary of Defense initiated a top-secret study known as STRAT-X, which was designed to investigate strategic weapon

systems which could form the basis for the nation's defense against nuclear attack during the late 1970's and beyond. The Study was tasked with evaluating not only the offensive capability of our own nuclear forces, but also with anticipating their vulnerability to possible or projected Soviet weapon systems. The candidate systems which were examined and therefore might be interpreted as being in competition with each other included long-range bombers, hardened silo-based intercontinental ballistic missiles, mobile land-based missiles, and ship or submarine-launched ballistic missiles. STRAT-X concluded that, were either the current land-based Minuteman ballistic-missile system or the submarine-based Poseidon ballistic-missile system to be replaced, then a hardened silo-based missile system was preferable to a mobile land-based system, and a new submarine-launched ballistic-missile system was recommended over a ship-based system. These recommendations were made in the STRAT-X Study Report, dated August, 1967.

19. In February, 1968, the Deputy Chief of Naval Operations established an Advanced Development Objective (ADO) ordering research and development to begin on an Undersea Long-Range Missile System (ULMS), which was the initial name for the Trident System, according to concepts established by the STRAT-X study.* Trident development was established in order for the United States to maintain the superiority and survivability of its sea-based nuclear deterrent force in the face of anticipated Soviet anti-submarine warfare improvements over the next few decades.

20. The ADO established certain strategic design characteristics that would be required for the Trident program, as determined by the STRAT-X study. Enclosure 2 to the ADO indicates that survivability was a vital factor in the selection of the Trident Sys-tem. To achieve this survivability, the system incorporated the use of a complete logistical support/refit facility capable of performing all repairs and weapon and consumable replenishment. This facility has also been termed "dedicated base." Home-porting of the submarine within the territorial United States was also established. The system design would be significantly influenced by the degree of reliability and maintainability attainable for the system components. The ADO contemplated Contract Definition (CD) in FY 1971 and an Initial Operating Capability (IOC) of late FY 1976, with flexibility, should the threat dictate, to accelerate to a CD of FY 1970 and an IOC of FY 1975.

21. During the period from 1968–1972, the Navy conducted numerous studies of possible configurations of the Trident submarine and established the preliminary characteristics of the different Trident components. A Trident steering group was set up to facilitate decisions regarding the system's characteristics and its operating rationale. This steering group was composed of the most senior levels in the Navy, including the Chief of Naval Operations, then Under-Secretary (later Secretary) of the Navy John Warner, and Admiral Rickover. During 1970–71, the Office of the Trident Program Coordinator (OP–21) was established under the Chief of Naval Operations with the responsibility of establishing the desired characteristics of the Trident System, and the Office of Trident Project Manager (PM–2) was formed under the Chief of Naval Material, with responsibility for acquisition of the entire Trident system.

22. In 1969, the Secretary of Defense requested that the Navy study alternative means of supporting the Trident System to increase its reliability, survivability, and cost-effectiveness. Planning for the study was initiated, resulting in completion of a proposal for the study in

---

* On May 16, 1972, the title of the project was changed from ULMS to Trident. The name Trident will be used throughout these Findings and Conclusions.

June, 1970. The study, called the Trident Site Selection Study, commenced during September, 1970, and began with consideration of 89 potential sites in the Atlantic and Pacific Oceans and the Gulf of Mexico. One requisite for the site, as established by the ADO, was that it be on United States territory. Other considerations were the operational requirements of the submarine, the capability of the base to support the Trident missile, minimization of environmental disturbance and availability of sufficient land. This study was under the Trident Project Manager.

23. Commencing in late 1970, there were a number of highly classified studies done under the Trident Program Coordinator that involved such areas as targeting, range of missiles, threats from anti-submarine warfare, and the potential operating area.

24. The design concept for the Trident submarine and missiles is generally as follows:

(a) 24 vertical launch tubes penetrating the main pressure hull (instead of the 16 tubes in current Polaris/Poseidon hulls);

(b) a larger nuclear power plant permitting the submarine to operate in larger ocean areas and to undertake longer patrols, with the goals of frustrating ASW (Anti Submarine Warfare) measures of assumed adversaries and allowing the submarine to be based at U.S. ports, thereby eliminating the need for foreign port facilities and forward based submarine tenders.

(c) a very quiet-running propulsion system, in order to make detection more difficult;

(d) a larger, longer-range missile with various features designed to make it very difficult for ABM's to shoot it down.

25. In September of 1970, preliminary refit facilities studies were initiated by defendants for the purpose of determining suitable Atlantic and Pacific locations for the sites to support the Trident System and to provide cost estimates for those sites.

26. Congress appropriated for fiscal year 1970 ten million dollars for research and development of the Trident Program.

27. On September 14, 1971, Deputy Secretary of Defense David Packard directed the Navy to commence engineering development of the Trident submarine and scheduled its deployment for 1981.

28. On November 1, 1971, Secretary of Defense Melvin R. Laird directed further study by the Navy of alternative sea-based strategic systems.

29. Congress appropriated 43.7 million dollars for research, development, test and evaluation of the Trident Program for fiscal year 1971.

30. The Navy's "Trident System" is a further development of the presently deployed Polaris/Poseidon nuclear-powered ballistic-missile submarines, which are a key element of the strategic deterrent force of the United States. The Trident System provides a long-range program for modernization and orderly replacement of the Polaris/Poseidon fleet.

31. The Trident undersea nuclear weapons system is composed of a number of individual components. First, the Trident submarine, a third-generation, nuclear-powered, ballistic-missile firing submarine (SSBN), which will not differ significantly in appearance from existing Polaris/Poseidon SSBN's, but will include important technological improvements. The improvements result in quieter operation, improved efficiency, easier maintenance, and greatly improved survivability in the face of an enemy anti-submarine warfare threat. First, each Trident submarine will be capable of carrying 24 intercontinental ballistic missiles, 8 more than Polaris/Poseidon submarines. Each vessel will be 560 feet in length, 135 feet longer than the largest Polar-

is/Poseidon. Second, the Trident submarine will initially carry the 4,000 mile range Trident I(C–4) missile, which provides significantly improved range over the 2,500 mile Poseidon missile currently deployed. Third, the larger Trident II(D–5) missile, which will be deployed in Trident submarines during the mid-1980's will have a further increased range and payload capability. With each of these longer range missiles, Trident will have millions of square miles of ocean in which to maneuver while remaining on target. This extended range is a particular advantage of Trident. Not only will Trident missiles be capable of reaching enemy targets from patrol areas over ten times the total available to today's SSBN's, thus obviating the need for expensive overseas ports for Trident submarines, but Trident will also confront potential enemies with the need for large, extremely expensive anti-submarine warfare (ASW) forces. Trident's increased range allows the selection of patrol areas to take advantage of seasonal storms or the wide variety of ocean-produced sounds to blunt the detection efforts of improved acoustic sensors which potential enemies may develop. Fourth, all 10 Trident submarines will be home-based at a site dedicated solely to their support located at the Navy's Bangor Annex, in Bangor, Washington.

32. The United States currently has a nuclear deterrent force of 41 Polaris ballistic-missile submarines (10 of which carry the short range Polaris Missile and 31 of which are Polaris/Poseidon, i. e., fitted with Poseidon ballistic missiles). All of these submarines were constructed over a 7-year period, between 1960 and 1967, with as many as 13 being built in one year alone (1964).

33. The nation's Polaris submarines have a designed life-span of approximately 20 years. Those submarines fitted with Poseidon missiles are assumed to last somewhat longer, and have an anticipated maximum effective life as an effective deterrent of 25 years.

34. To maintain an effective system and avoid a reduction in our ballistic-missile submarine force, a proven replacement must be available by 1980. Replacement is necessary since the Polaris/Poseidon submarines were laid down with the technology of the 1950s, and, as ships age, they become more ineffective, inefficient, and dangerous. Time for repair increases dramatically, with some recent overhauls of Polaris submarines lasting five times as long as originally planned.

35. There is a program to back-fit Trident I missiles into 10 of the Polaris/Poseidon submarines, commencing in 1979, with completion scheduled for 1982. This will provide increased missile range for these 10 ships, and, by increasing their possible area of operation in the Atlantic Ocean, they will have increased survivability until they can be replaced by an adequately modern submarine force. This system is not a realistic alternative to the Trident. The United States cannot meet anticipated enemy ASW challenges through the beginning of the 21st Century by backfitting technologically new equipment into old submarines which will soon reach the end of their assumed life expectancy (the newest Polaris/Poseidon submarine will reach its anticipated retirement age in 1992), nor can new submarines be built along operationally outmoded designs. The growth potential remaining in present-day SSBN's provides only for modest improvements in quietness, sonar and missiles. Department of Defense officials have testified before Congress that significant noise reductions in submarine performance are necessary to maintain a lead against anticipated Soviet acoustic detection improvements. These noise reductions, which have now been technologically perfected, are possible only through development of a newly designed submarine. They cannot be backfitted into existing submarines, nor can newer built Polaris/Poseidon submarines accommodate the D–5 missile.

36. "SSBN–X" is an acronym standing for an experimental nuclear-powered ballistic missile submarine which the Department of Defense proposed as a research and development project to the Congress during early 1974. Funding of this project was not approved and it was cancelled by the Department of Defense in mid-1974. SSBN–X has never been envisioned as an alternative to the proposed 10-ship Trident submarine fleet, but rather as a follow-on less capable complement to Trident.

37. A dedicated site is one at which all tasks necessary for maintenance, repair and support of the submarine can be accomplished. This concept was adapted from the practice then in use at overseas bases. Since 1960, Polaris submarines have been supported at bases in Guam, Marianas Islands, Holy Loch, Scotland, and Rota, Spain, with ships and facilities maintained at those bases solely for that purpose.

38. A dedicated site is essential for the achievement of the objectives of the Trident System including the main objectives of survivability. The Trident System has a survivability advantage over land-based systems only while the submarines are at sea, so the Trident system objective was to obtain the longest patrol period and shortest refit period possible. The goal set up in the STRAT–X Study for ULMS was an 80% at-sea time, as contrasted with a 50% at-sea time presently realized by the Polaris/Poseidon system. A dedicated site will make the system more cost-effective, maximize the deterrent capability of the system by maximizing the time at sea, insure high survivability of the submarines due to short refit cycles, increase crew morale, and avoid degradation of the missiles with associated reduction in reliability and increased explosion hazard.

39. Due to the shortness of range of the Polaris/Poseidon ships and missiles, forward basing in other countries is necessary. This results in problems in terms of our foreign relations with other countries, including but not limited to those in which the bases are located. Homeporting of the Trident within the territorial United States is necessary to avoid these problems, and is made possible by the greater design range of the Trident missiles and submarines. Homeporting Trident in the United States will also simplify logistics, improve crew morale, and maximize the time the ship will be at sea. Transit times to patrol areas are also avoided; missiles can be "on target" immediately after leaving the port.

40. The strategic deterrent forces of the United States are made up of three different elements: land-based intercontinental ballistic missiles, long-ranged manned bombers, and submarine launched ballistic missiles. Each of these deterrent force elements is necessary for the maintenance of a stable balance of deterrents.

41. Recent developments which enhance the accuracy of weapon delivery systems have generated concern about the increased vulnerability of the land-based strategic systems. Currently, defense establishments for both superpowers are tending toward increasing the sea-based portions of their deterrent since these are less vulnerable.

42. A stable balance of deterrents between superpowers is deemed imperative if world peace is to be maintained and the relative vulnerability of the deterrent forces of each power is an important element in assessment of stability. The greater the vulnerability of a given side's forces, the greater the likelihood that a preemptive first strike will be launched by the other side during a time of severe political tension.

43. On December 14, 1972, the Trident System was approved for inclusion in the Top National Category of the Master Urgency List, designated "BRICK–BAT." Brickbat is the highest priority category in the nation for procurement of materials critical to a project. The only other strategic weapons system currently accorded this priority

are Poseidon and the Minuteman III missile.

44. On May 26, 1972, representatives of the United States and the Soviet Union reached an interim agreement limiting the number of strategic offensive weapons held by each country, including the number of submarine-launched ballistic-missile (SLBM) launchers and modern ballistic-missile submarines (Interim Agreement Between the United States of America and the Union of Soviet Socialistic Republics on Certain Measures With Respect to the Limitation of Strategic Offense Arms, May 26, 1972, T.I.A.S. 7504). The accompanying Protocol specified that the United States may have no more than 710 ballistic-missiles launchers on submarines and no more than 44 modern ballistic-missile submarines as compared to 62 for the Soviet Union. One of the reasons for the disparity was that the United States policy at that time made it possible for its submarines to be on station for longer periods of time than could the Soviet boats.

45. In November, 1974, President Ford and Secretary General Brezhnev entered into an agreement in Vladivostok providing for an overall limit of 2400 strategic nuclear delivery vehicles for each side, with a sub-limit of 1300 MIRV missiles. The agreement also provided that within those limits each party would have full freedom to provide as much of a land-based missile deterrent, as much of a sea-based deterrent, or as much of a long-range bomber based deterrent as it wants. It is hoped that the present negotiations toward an agreement that will replace the interim agreement of 1972, called the SALT I agreement, will follow the lines of the Vladivostok agreement, and it is also expected that under the new agreement both sides will attempt to move more and more of their deterrent forces to sea, thereby decreasing their vulnerability.

46. The only time that an SLBM force has increased survivability over a land-based system is when the submarines are at sea, hence it is necessary to have a system that will maximize the time at sea. A dedicated site, which maximizes sea time, is therefore essential for the deterrent and strategic effectiveness of the system.

47. It has been determined by appropriate officials of the Executive and Legislative Branches that the Trident System is necessary for reasons of national security and foreign policy. Those responsible for the security of the United States have thus determined that Trident is necessary for that security and a dedicated site homeported in the territorial United States has been determined to be essential for its support. It has not been shown that there is a reasonable likelihood of early termination of the Trident Program.

48. Deployment of the Trident Submarine in the Pacific is highly desirable in the interest of stability in the relationship between the deterrent forces of the United States and Soviet Union. This is because deployment in the Pacific provides a greatly enlarged area of dispersal over the use of the Atlantic and makes detection much more difficult, resulting in much greater invulnerability. In the face of increased expenditures by the Soviet Union for anti-submarine warfare (ASW) detection and killer techniques, it is a great advantage from the standpoint of dispersal of the deterrent to have it deployed in as wide an ocean area as possible. In addition, deployment of the Trident in the Pacific and Poseidon in the Atlantic poses a two-ocean SLBM force, making ASW measures even more difficult and increasing survivability further.

49. During the period from September, 1974, to the present, the threats to the existing submarine deterrent have increased, and the need for Trident has increased correspondingly. It is greater now than at any previous time. Trident is considered to be the foremost deterrent system the United States will possess in the near future.

50. If development of the Bangor site were enjoined or otherwise halted, a time period of up to five years would be required to provide the necessary planning, including an environmental impact statement, for a substitute base. This would result in a delay of at least two years in the deployment of the Trident system and imperil our national defense.

51. An injunction in this case at this time, given the state of conditions in the world, given the on-going negotiations on the follow-on agreement to the interim SALT I agreement, given the perception of the balance between the Soviet Union and the United States in terms of their strategic nuclear forces, perceptions both in the United States and in the Soviet Union as well as on the part of third parties, would have a powerful adverse effect on the ability of the United States to conduct its foreign relations.

52. The environmental protection division of the environmental protection agency of the Navy, designated OP–45, was established within the Navy to be responsible for interpretation of environmental guidelines and review of environmental assessments and candidate environmental impact statements (CEIS) to determine compliance with appropriate regulations. OP–45 sent out a memorandum on March 9, 1971, directing all military departments to review all significant items that could be of environmental concern. It was further requested that for items which could significantly affect the environment, information be supplied to OP–45 based on OP-NAVINST 6240.4A.

53. In response to that memorandum, an environmental assessment of the Trident Project was prepared. This assessment concluded that since the weapon system in Trident would have no environmental impact under peacetime operation, no EIS was necessary. It also pointed out that, from an environmental standpoint, the submarine was the equivalent of existing submarines.

54. This assessment was reviewed by OP–45, and it concluded that the assessment did not comply with the regulations in that the five points enumerated in OPNAVINST 6240.4A were not specifically addressed. A memorandum to this effect was sent to the Trident Program Manager in May, 1971, requesting an assessment enumerating the five points.

55. On November 1, 1971, the Deputy Secretary of Defense requested the Secretary of the Navy to study alternative means of providing early deployment of an advanced submarine-launched ballistic missile (SLBM) system. This study was a response to recent changes in the Soviet threat and the potential outcome of the then on-going Strategic Arms Limitation Talks.

56. In accordance with this request, the Navy did a study and determined that the best means of obtaining an early development of an SLBM system was expeditious development of Trident. Many options were considered before this was confirmed as the best course of action.

57. On December 23, 1971, the Secretary of Defense made the decision to proceed with the Trident Program as rapidly as possible and designate an IOC of 1978. During the period 1968–1971, the tentative IOC of Trident had been adjusted numerous times, varying from FY 1975 to sometime in the early 1980s. This decision of December 31, 1971, dictated by Polaris obsolescence and international tensions, represented the first time that a firm date for the Trident IOC was set, and it represented a restoration of the original schedule as envisioned in the ADO as nearly as feasible. The Trident program was thus timed to produce a new ship that could be available in a rotatable force at about the time the oldest Polaris reached the end of its anticipated lifespan.

58. As a result of this decision, the Department of Defense requested and received an increased level of funding from Congress for FY 1973. Total ap-

propriations for Trident for the year were $820.9 million, up from $104.8 million in FY 1972. Included was the first funding for Trident construction, in the amount of $311 million.

59. On January 28, 1972, the ULMS Refit Complex Site Selection Final Report was issued consisting of several volumes that are summarized in Ex. 177. Of the 89 sites initially identified, 19 were nominated for further consideration, as they satisfied the minimum criteria for a suitable site. These sites were then evaluated in greater detail for their ability to support the weapons system and the operational aspects of each site. A summary description of the characteristics and requirements of the system that influenced the nature and scope of the Trident refit facilities is contained in Ex. 178. Other tangible aspects were also analyzed, including enviromental factors. The final report recommended four candidate sites as capable of accommodating the Trident Support mission in a satisfactory manner; Charleston, South Carolina; St. Mary's, Georgia; Cape Kennedy, Florida; and Bangor, Washington.

60. The site selection study was premised on the need for a dedicated support site homeported in the United States, as envisioned in the STRAT–X study and the ADO. Other parameters were the operational requirements of the submarine, the capability of the base to support the Trident missile, minimization of environmental disturbance, and availability of sufficient land. Various IOC's were used until the decision of the Secretary of Defense in December, 1971.

61. Throughout the Site Selection Study, the effects on the environment were discussed and weighed in the decisions. The selection process considered such environmental factors as the need for relocation of communities, highways and waterways; population densities; the amount of cut and fill needed for development; the proximity of national wildlife refuges, national parks, historical areas, and state parks; the need for

filling, dredging or otherwise altering marshes and wetlands; the impact on waterfowl, fish and hard shell crustaceans and associated industries; the need to build road or rail access; the need for dredging, both initial and maintenance, and its influence on river flows and currents; the impact of spoil disposal; the impact on commercial and recreational boating; the impact on the economy and the labor market; the need for land acquisition; and the ability of the communities to absorb growth.

62. This study confirmed that existing facilities cannot serve the needs of the Trident Program for a number of reasons. The propulsion substances used in Trident missiles are more powerful than those in present SLBM's and, therefore, safety requires that a larger area around missile handling facilities be free from population. Therefore, to use existing facilities elsewhere, it would be necessary to buy up large areas and relocate vast numbers of people. Floating drydocks at existing facilities are unable to handle the Trident submarine, and a new floating drydock would not be economical.

63. Bangor, Washington, was the only one of the final four sites located on the Pacific Ocean. Two other sites on the Pacific, Humboldt Bay and Point Arguello, California, were among the 19 sites evaluated in detail. Humboldt Bay was rejected due to the need for acquisition of a large amount of private land and relocation of many people, along with a need for extensive dredging and other factors. Point Arguello, among other things, would have required a great amount of earth moving, including filling in a number of canyons, and would have required a harbor.

64. It was determined that there would be some environmental impact in building a base to support the Trident System. Therefore, in complying with the directions from OP–45 to prepare an assessment in the proper format, the Trident Project Manager decided that a Candidate EIS would have to be pre-

pared for each of the potential support sites. As soon as sufficient information was available to identify the sites that appeared to be suitable for the Trident System, preparation of the CEIS was initiated. On February 14, 1972, the Commander, Naval Facilities Engineering Command, forwarded Draft Candidate Environmental Impact Statements on proposed sites in St. Mary's, Georgia, Cape Kennedy, Florida, and Bangor, Washington to the Trident Project Manager, and the Draft CEIS for Charleston, South Carolina, was forwarded soon after.

65. The request of OP–45 for a more detailed assessment of the Trident Program was met by a draft CEIS for Trident received by OP–45 on March 31, 1972. It was accompanied by a draft CEIS for a typical site and one for the Trident submarine. These draft CEIS's were reviewed by the CNO Environmental Impact Assessment Review Panel on April 21, 1972, and the panel was also given evidence that there were at that time four potential sites under consideration—St. Mary's, Georgia; Cape Kennedy, Florida; Charleston, South Carolina; and Bangor, Washington.

66. The review panel determined that a draft EIS for the refit facility was needed *after site selection was accomplished.* It was also determined that the CEIS for the typical refit facility should be modified, addressing certain additional environmental aspects for each of the sites under consideration, and resubmitted to OP–45. And the Trident Project Manager was informed that the candidate statement for the typical Trident refit site should be utilized in the decision-making process that would result in the site selection.

67. In accordance with the then current CEQ guidelines, the Navy determined that the Trident Program was composed of a number of actions, as defined in the applicable Navy regulations. These actions included the submarine, the missile system, the refit facility, the power plant, the communications support system, and the launching base at Cape Canaveral.

68. As a result of the direction from OP–45, the Trident Project Manager understood that the CEIS's on the four sites had to be updated and submitted to the Trident Coordinator for use in selecting the ultimately proposed site. In response, the four CEIS's were forwarded to the Trident Coordinator. Subsequently, after modification, updated versions were forwarded in February, 1973.

69. During May, 1972, the Navy issued an Environmental Impact Assessment on its nuclear propulsion plants. Attached to this assessment was a report, dated February, 1972, entitled "Environmental Monitoring and Disposal of Radioactive Wastes from United States Naval Nuclear Powered Ships and their Support Facilities."

70. To obtain CEQ's opinion regarding the method of treatment of the Trident project, talks with CEQ were initiated by the Navy in July, 1972. After a meeting on August 10, 1972, Dr. Gordon MacDonald of CEQ indicated by letter that he felt it had been agreed that the Navy would prepare statements on four general areas: the program as a whole, the construction of various components of the system, the refit site, and the nuclear propulsion system. In response, the Navy indicated by letter of September 29, 1972, that. it had been agreed that the four categories were useful in analyzing the need for impact statements. However, the Navy did not feel it had been determined at that time that statements were necessary for all four categories. The letter stated that the Navy had agreed that statements were needed for the new Trident base and the nuclear propulsion system. However, it was questioned what remained to be evaluated by a program statement, if, as agreed, each of the components would be assessed, and all weapons systems that could be alternatives, if any, were covered by statements of their own. It was also questioned how the construction of the components would be assessed in the

light of the present procurement regulations, and the fact that the components were mobile elements. The response from the General Counsel of CEQ on March 1, 1973 took issue only with the Navy's questions regarding the need for statements regarding construction of the components of the Trident Program. CEQ's letter did not question the Navy's position that a program statement was not appropriate for the Trident System.

71. Also in early 1972, at a time when a number of naval facilities were being closed in an overall base cutback, the Chief of Naval Operations ordered a study conducted to review the concept, scope, cost and practical locations for an integrated Trident refit complex, and to consider the possibility of non-integrated support for Trident which could utilize existing facilities that would otherwise be closed. These reports, dated July 12, 1972, and July 17, 1972, entitled Trident Refit Complex Study Report and Trident Alternative Refit Concepts, respectively, concluded:

(a) that a single integrated refit complex was necessary for Trident support;

(b) that utilization of existing tenders, and floating drydocks is precluded by the size of Trident. Construction of larger floating drydocks is not as cost-effective as providing the same capability in shore-based facilities;

and

(c) that the employment of existing shipyards would result in small if any savings to the Navy, but would neither accomplish Trident's goal of a high at-sea time to in-port time ratio nor leave sufficient shipyard space for non-Trident work.

The study noted that the costs of additional facilities and drydocks that would be required to handle work displaced by adding Trident refits to an existing shipyard had not been included. In October, 1972, these reports were forwarded to the Chief of Naval Operations with the recommendation that no change be made from the self-contained refit complex as originally envisioned in the STRAT-X report. As a result of these studies, the Chief of Naval Operations re-affirmed the decision to base the Trident submarine at a co-located site, which had been an integral part of the Trident System since 1967.

71. In October, 1972, the Office in Charge of Construction—Trident (OICC) was set up under the Naval Facilities Engineering Command to perform the planning, design and construction of the shore facilities in support of the Trident system. This Office was formally approved by the Secretary of the Navy in April, 1973, and became an independent organization about August 1, 1973.

73. On October 6, 1972, the Chief of Naval Material recommended to the Chief of Naval Operations that Charleston, South Carolina be selected as the site for the Trident Refit Complex. It was further stated that, if initial development was in the Pacific, Bangor, Washington, was the recommended site. The letter also recommended use of an integrated and self-contained refit complex for support of Trident.

74. On February 12, 1973, the Chief of Naval Operations recommended to the Secretary of the Navy that, after consideration of factors regarding ocean area selection, i. e., Atlantic or Pacific, the advantages lay heavily with the Pacific and therefore he recommended Bangor, Washington, as the initial Trident refit site. In the analysis of the relative advantages of the two oceans, the environmental assessments of the candidate sites were available to the decision-makers, and environmental aspects were considered in arriving at the decision. The size of the Pacific as compared to the Atlantic had an overwhelming impact, and, with Poseidon already in the Atlantic, a two ocean SLBM force would be more survivable. These strategic considerations were of such overwhelming importance to national security that the

decision to deploy Trident in the Pacific could not be outweighed except by environmental considerations of a catastrophic nature. But the decision to utilize Bangor as the Pacific base for the Trident Support Site was still tentative and open to reversal if environmental effects were of sufficient magnitude to dictate another Pacific base. If, during the course of the detailed environmental study of the Bangor site, there were found some irreversible and highly significant impact on the area disproportionate to strategic and tactical needs, the decision would be reviewed, and, if necessary, other sites would be considered for feasibility.

75. On 12 February, 1973, the Secretary of the Navy notified the Secretary of Defense of the fact that the Navy, after considering all factors including environmental assessments of the candidate sites, had determined that initial Trident development should be in the Pacific. He, therefore, recommended initial development of Trident in the Pacific from a refit site at Bangor, Washington, and requested approval.

76. On February 15, 1973, the Deputy Secretary of Defense approved the decision of the Secretary of the Navy to deploy Trident in the Pacific for strategic reasons, and therefore to select Bangor for the initial refit site.

Bangor was chosen as the proposed site because it was the only one of the four sites determined to be suitable for strategic and tactical reasons for the Trident System that was in the Pacific, and it had been determined that Pacific basing was necessary for the maximum effectiveness of the system.

77. On February 16, 1973, a letter was sent from the Navy to numerous Senators and Representatives informing them of the selection of Bangor as the proposed Trident Support Site, after consideration of numerous factors, including environmental assessments of Bangor. They were informed that an indepth environmental study would be done, leading to the filing of an Environmental Impact Statement. From that time on, there were many briefings and meetings between Congressmen and Navy Personnel, in which the question was raised as to whether the decision to go to Bangor was tentative. The answer was always that the decision was subject to review if some irreversible or important environmental effect outweighing missile effectiveness was identified.

78. Immediately after selection of Bangor as the proposed site, a monitoring team was established in the area to gather samples and baseline data relating to areas of possible environmental impact. The ongoing environmental studies were initiated in April, 1973, with representatives of numerous federal, state and county agencies where the scope of studies was discussed. The data collection was commenced in June, 1973, continued through preparation of the EIS and is continuing now. In addition, an environmental monitoring system has been set up to maintain surveillance of the environment during construction.

79. After the selection of Bangor as the proposed site, in February, 1973 the OICC proceeded with the necessary advertising to inform the architect-engineer (A–E) firms that the Navy was proceeding with initial planning and design of the facility at the Bangor site. The advertisements and announcements sought an A–E firm that would be interested in doing the designing and planning for the site and the EIS. Through standard contracting procedures a Joint Venture consisting of the firms of Henningson, Durham and Richardson, Inc., (HDR), Gibbs and Hill, Inc. and Parsons, Brinckerhoff, Quade and Douglas, Inc., (PBQD) was awarded the contract. Other firms associated with the Trident Joint Venture (TJV) were Durham, Anderson and Freed (DAF) and Kramer, Chin and Mayo (KCM). The contract between the Navy and the Trident Joint Venture was signed June 22, 1973, and provided for the TJV to pre-

pare for the Navy three reports regarding the support site—the Preliminary Engineering Studies, the Preliminary Master Plan, and the Environmental Impact Statement. The procedure of having the EIS and preliminary planning prepared by the same concern is similar to the procedures followed by the Federal Highway Administration as set out in their regulations.

80. On April 4, 1973, representatives from EPA participated in a preliminary briefing by the Navy regarding the Environmental Studies being conducted for the proposed base.

81. To better provide for consideration of the environment and to integrate environmental factors into the engineering and planning processes, the work of the three portions of the TJV contract were carried on in parallel. Throughout the work, the environmental staff members maintained close contact with the staff performing the planning and engineering studies. As a result of this interaction, which could best be accomplished by the method of awarding the contracts concurrently to associated firms, such items as selection of building sites and design of facilities had environmental input. In addition, an environmental constraint map was prepared by the EIS team, which was used by the engineers and planners in their first developments. As a result, the engineers and planners were aware of environmentally sensitive areas, and could take precautions to avoid them.

82. The TJV members were instructed by the Navy on the need for strict environmental consideration. They were instructed to develop imaginative and innovative designs to avoid adversely affecting such local phenomena as the salmon fingerling migrations, and to attempt to keep the need for land acquisition and its consequent displacement of people to an absolute minimum. One example of their response is the change in the design of off-shore facilities to utilize pile-supported structures so that the salmon migrations could continue to utilize the shallow water near the shore.

83. The Trident Joint Venture set up a Center for Public Comment in Silverdale, near Bangor, to allow any member of the public to obtain information about the Trident Support Site.

84. Commencing in August, 1973, the on-site representative of the Navy made contacts and discussed the Trident Project with many federal, state and local agencies, including EPA and others having environmental expertise. Members of the Trident Joint Venture had a number of early meetings with the technical staff of EPA regarding the proposed data program, and each of the several sub-contractors working on the data for the Trident Support Site made individual contacts with various federal, state, and local agencies, including EPA.

85. The TJV submitted a Preliminary Draft EIS to the Navy on September 10, 1973, and the Navy made comments on it. The TJV submitted a second Preliminary Draft EIS, together with technical studies to the Navy and local officials for comment on December 17, 1973. Both drafts were revised in response to the comments received.

86. By letter of September 26, 1973, representatives from Region X of the EPA were invited to attend a second briefing, held October 11, 1973, dealing with preliminary findings and additional data.

87. EPA was furnished the Preliminary Draft EIS of December 17, 1973, and the technical studies used in its development. On January 8, 1974, they provided their comments to the Trident Joint Venture through the Federal Regional Council's Trident Subcommittee.

88. EPA was among the numerous agencies that were invited to and sent representatives to a pre-release briefing on the Trident Support Site Draft EIS on March 22, 1974.

89. Data from a full year was gathered and examined in the course of preparation of the Environmental Impact

Statement on the Trident Support Site at Bangor. An examination of the data gathered subsequent to the Draft EIS confirmed the conclusions reached therein. While additional data could have been generated if there had been more time, the data that was gathered was sufficient to reasonably determine the environmental impact of the project.

90. The Draft Environmental Impact Study, Trident Support Site, Bangor, Washington, was submitted to the Council on Environmental Quality on March 21, 1974, and notice of the submission was published in the Federal Register on March 29, 1974.

91. The EIS Review Panel within OP–45 reviewed the Draft EIS for the Trident Support Site and determined that the directions given as a result of their meeting of April 21, 1972 to the Trident Project Manager had been carried out.

92. The Draft EIS was sent to all appropriate federal, state and local agencies, and to members of the public who had. indicated interest in the project. Copies of the EIS were also made available to the public in the Center for Public Comment in Silverdale, Washington.

93. On April 24 and 25, 1974, a public hearing was held in Silverdale, Washington on the Draft EIS for the Trident Support Site at Bangor, Washington. The hearing was attended by about 750 persons, of whom about 100 made presentations. The transcript of the entire hearing is contained in Volume II of the Final EIS on the Trident Support Site.

94. The Navy requested that comments on the Draft EIS be sent to Commander Dunn at the Trident Office in Kitsap County prior to May 31, 1974. This allowed 63 days for review and comment. Detailed comments were received from federal, state and local agencies, and many members of the public, including the plaintiffs. The comments were then classified according to subject matter by the TJV and responses were prepared and included in the Final EIS. There were no requests received for an extension of time in which to comment on the Draft EIS.

95. On May 29, 1974, a meeting was held among Senators Jackson and Magnuson and Congressman Hicks of Washington, various representatives of the Departments of Defense and Navy, the Kitsap County Commissioners and two representatives of the State of Washington. The purpose of the meeting was to discuss the social impacts of the Trident Support Site, and to commence planning and preparation for mitigating the impacts. There was a deviation between the fiscal impacts as developed by the state and county governments. It was agreed that relief would be sought for the areas impacted by the Trident Program through existing federal programs. The state and county would continue planning, develop specific plans, and submit them to the Federal Regional Council for action and financial assistance. In addition, Senator Jackson stated he would introduce special legislation to authorize the Department of Defense to budget funds for the impacted community when the existing programs would not provide them.

96. Following the meeting the Navy briefed the various federal agencies on the needs of the local agencies. The Office of Economic Assistance in the Office of the Secretary of Defense was established as the intermediary between the Department of Defense, which would identify the impacts, and the various federal agencies which would budget for the needs as they were identified. At a meeting on May 30, 1974, the Office of Management and Budget stated that it would give special emphasis to the Trident impacts.

97. As a result of the identification of impacts in the Trident EIS, planning money has been made available to the state and county for preparing the detailed plans needed for schools, roads, housing, etc. As the plans are prepared, they are submitted to the Federal Regional Council in Seattle and submitted

to the appropriate federal agencies for inclusion in their budgets. In addition, the Secretary of Defense has been authorized to support items that might not come under the purview of other federal agencies, and an amount for funding has been included in the FY 1976 budget and the planned FY 1977 budget. Trident-related federal assistance to local governments in FY 1974-75 amounted to over $6,000,000.

98. The Final Environmental Impact Statement, Trident Support Site, Bangor, Washington (Final EIS), was submitted to CEQ on July 19, 1974, and notice of the submission was published in the Federal Register on July 30, 1974.

99. The Navy had then completed preparation of Environmental Impact Assessments, Candidate EIS's, or Draft and Final EIS's, as appropriate, on every action involved in the Trident Program.

100. During the time that Trident has been under consideration the following environmental assessments and statements have been prepared for various aspects of the Trident Program:

A. The Trident Program
1. Environmental Impact Statement Assessment, April 12, 1971
2. Candidate Environmental Impact Statement (CEIS) for ULMS, March 31, 1972 (Ex. 7)

B. The Trident Ship System
1. Environmental Impact Assessment, July, 1973 (Ex. 9)
2. CEIS, Trident Project Ship System, November 30, 1973 (Ex. 32)
3. Environmental Impact Assessment, December 29, 1973 (Ex. 33)

C. The Trident Submarine
1. CEIS, March 31, 1972 (Ex. 7)

D. The Trident Weapons System
1. Environmental Impact Assessment, July, 1974 (Ex. 8A)
2. Updated Environmental Impact Assessment, February, 1975 (Ex. 8B)

E. The Nuclear Reactor
1. Draft Environmental Impact Statement, August 25, 1972 (Ex. 10)
2. Final Environmental Impact Statement, December 27, 1972 (Ex. 10).

F. Typical Trident Refit Facility
1. CEIS, March 31, 1972 (Ex. 7)

G. Trident Support Site, Bangor, Washington
1. CEIS, February 10, 1972 (Ex. 14)
2. CEIS, February 8, 1973 (Ex. 18)
3. Preliminary Draft EIS, December 17, 1973 (Ex. 4)
4. Preliminary Draft EIS, February, 1974 (Ex. 3)
5. Draft EIS (5 Volumes), March 21, 1974 (Ex. 2)
6. Final EIS (5 Volumes), July 19, 1974 (Ex. 1)

H. Potential Trident Support Sites
1. CEIS, St. Mary's, Georgia, February 10, 1972 (Ex. 12)
2. CEIS, St. Mary's, Georgia, February 10, 1973 (Ex. 19)
3. CEIS, Charleston, South Carolina, March 6, 1972 (Ex. 13)
4. CEIS, Charleston, South Carolina, February 10, 1973 (Ex. 20)
5. CEIS, Cape Kennedy, Florida, February 10, 1972 (Ex. 15)
6. CEIS, Cape Kennedy, Florida, February 10, 1973 (Ex. 21)

I. Trident Wharf and Turning Basin
1. Draft EIS, March 9, 1973 (Ex. 163)
2. Final EIS, December 10, 1973 (Ex. 11)

J. Trident Office Building, Bangor, Washington
1. Environmental Impact Assessment, December, 1973 (Ex. 23)

K. Indian Island Conventional Ordnance Facility
1. CEIS, November, 1974 (Ex. 24)

The defendants also conducted the following studies that incorporated and

**474**

considered environmentally related factors:

A. Trident Refit Complex Site Selection Final Report, January 28, 1972 (Ex. 177)

B. Trident Refit Complex Study Report, January 31, 1972 (Ex. 178)

C. Trident Refit Complex Study Report, July 12, 1972 (Ex. 42)

D. Trident Alternative Refit Concepts Report, July 17, 1972 (Ex. 41)

E. Summary of Site Screening Data and Evaluation of Suitable Sites, July 19, 1972 (Ex. 40).

101. Copies of the Final EIS were distributed to Members of Congress and made available to the public in the Library of Congress and the libraries and universities in the State of Washington, as well as furnished to people who had indicated a prior interest.

102. The EIS indicates, either explicitly or implicitly, the mitigation efforts with respect to each significant effect. In many cases, when informed of a potentially adverse effect, the Navy determined that an ameliorative action would be taken. Thus the impact as stated in the EIS does not appear as severe as it would have been without the Navy's commitment to take mitigative action. Furthermore, during preparation of the Final EIS and while responding to comments on the Draft EIS, the Navy made certain agreements and commitments to deal with and ameliorate certain effects, and is carrying out those commitments.

103. After the selection of Bangor as the proposed Trident Support Site, the Navy initiated a program to gather data to serve as an environmental baseline for impact analysis. This data gathering program is still continuing. Statements in the EIS regarding the flora and fauna of the area were based in part on these studies, and also utilized sampling data from other agencies. This data was gathered by competent professionals and analyzed to arrive at the conclusions in the EIS (Ex. 2, Vol. 5). For example, for the marine biology and fisheries impacts, the studies were conducted by an expert in the field and the statements in the EIS are based on his conclusions. While there may be disagreement with the statements in the EIS, they are admittedly disagreements among experts involving matters of personal judgment. There is no indication that the Trident Support Site will have any significant effect on the flora and fauna of the area that is not detailed in the EIS. While the studies forming the basis for the conclusions in the EIS are sufficient for that purpose, it is conceded by all parties that more studies would be beneficial. It is noteworthy in this regard that, despite much activity in Hood Canal by the Washington State Department of Fisheries and the University of Washington for over 50 years, no data on such obviously important matters as the number of salmon migrating out of the Canal has ever been gathered.

The Navy is not only continuing its baseline studies even after the completion of the EIS, but it has also demonstrated its concern for the environment by actively negotiating with other experts for additional research.

104. In evaluation of the water resources of the Bangor Annex, the Navy utilized an extensive literature search and field investigation employing the standard technique of taking random test borings to get general indications and later making detailed borings where necessary. These tests indicated that an artesian condition existed and further detailed testing was required, and this was reflected in the EIS and in the preliminary and final master plans. These further tests showed the artesian pressure to be greater than would have been normal or expected. At that point the Navy retained competent professional consultants and, after meeting with knowledgeable state and federal officials, performed extensive tests. These tests indicated the need for further tests that were performed in April, 1975.

These tests confirmed that the water supply for the base can be developed from the groundwater as anticipated in the EIS, and monitoring during the tests has demonstrated that there will be no problems with salt-water intrusion.

105. The analyses of the economic impacts of the project were performed by competent professionals using recognized methods, reasonable projections and an appropriate time period. Primary and secondary impacts were identified for properly defined impact areas, in accordance with the CEQ guidelines. This is a complicated matter, subject to disagreement among experts regarding both the type of analysis to utilize, given the large number of techniques available, and the manner of application of any given methodology. That a given methodology was not used is not determinative of the adequacy of the technique actually employed.

106. One of the major impacts of the Trident Program will be the fiscal impact on the local and state agencies. This is sufficiently identified and analyzed in the Draft EIS, the comments, and the Final EIS to fully inform the Navy and the appropriate agencies of the fiscal implications. The Navy initiated coordination with state and local agencies regarding Trident as soon as possible and has continued coordination up to the present time. As a result of this coordination, there has been extensive work in identifying more exactly the extent of the impacts, and planning efforts have been initiated so that the financial needs will be met.

107. Questions have been raised about the possibility of a 20-boat fleet. There is at present no active planning for a 20-boat fleet at the Bangor base. In both the Preliminary and Final Master Plans for the Trident Support Base at Bangor, development of the land use plan included design of the facilities in such a manner that if at some uncertain time in the future it was felt that a 20-boat fleet was needed, and Bangor was selected as the site for the additional 10 boats, the additional facilities could be accommodated into the then existing development. Such land-use planning is prudent considering the large explosive safety radius required for the Trident within which no dwelling could be built. The current approved Trident program by the Department of Defense and the Congress is a 10-ship Trident fleet, with direction to consider going beyond that number only for planning purposes. The construction rate is for three ships every two years.

108. The 10-ship Trident force has no connection with the possibility that additional boats will be authorized in the future, and the strategic value of the proposed 10-ship Trident submarine fleet is not necessarily related to additional submarines authorized in the future. No decision has been made by the Congress and no recommendation has been made by the Department of Defense for construction of an eleventh, twelfth, etc., Trident submarine. Further, if such additional submarines are ever proposed, it is presently impossible to predict where they would be based and in what ocean they would operate. It would be inappropriate to present the impacts of a speculative 20-boat fleet in the EIS for the Trident Support Site at Bangor, since that is not the program being proposed.

109. Although it early appeared from strategic and tactical considerations that Trident should be based on and operate in the Pacific and that Bangor was likely the most suitable base for such operations, it was not until publication of the Final EIS that the final decision was made to locate the Trident Support Site at Bangor. This is substantiated by the fact that many of the documents about the Bangor Site between February, 1973, and August, 1974, refer to the site as the proposed site. The Draft and Final EIS's and the comments on the Draft EIS were reviewed by the Navy, and there was nothing in any of them to indicate that the environmental impact of the proposed placement of the site at

Bangor was such that the decision should not be affirmed.

110. On August 22, 1974, the Officer in Charge of Construction for Trident prepared a detailed memorandum of the consideration given to the environment by the Navy and stated that, since the EIS was adequate, it was appropriate that the construction process be initiated.

111. On August 28, 1974, the Project Manager, Trident System, forwarded to the Secretary of the Navy, through the Chief of Naval Material and the Chief of Naval Operations, his statement that the Trident EIS had been completed and filed in compliance with NEPA, and that the only objection to the Final EIS had been this suit. He concluded that since full consideration had been given to the probable environmental consequences, the Officer in Charge of Construction—Trident was going to proceed with advertising for design and construction of facilities at the base unless otherwise directed. His letter was accompanied by a summary of the consideration given to the environment throughout the selection process. On August 30, 1974, the decision to proceed with construction of the Support Site was endorsed by the Chief of Naval Operations, and on August 31, 1974, it was endorsed by the Chief of Naval Material.

112. After that approval, the invitation for bids was issued for the first construction contract at Bangor, for clearing and foundation work on the Trident Training Facility.

113. EPA reviewed the Trident Draft EIS and classified it ER–2, indicating there was insufficient information in the Draft EIS to fully assess the environmental impacts, and that the agency had reservations concerning the environmental effects of certain aspects of the proposed action.

On August 16, 1973, EPA notified the Navy that the Final EIS for the Trident Support Site included very substantial response to the EPA comments on the Draft EIS, and consequently, their environmental reservations were withdrawn, and they had no objection to the proposed plan. Notice of this was published in the Federal Register on September 23, 1974.

114. The Naval Ammunition Depot, Bangor, Washington (Bangor Annex) was established in 1944–45 as a Pacific Coast transhipment point for ammunition and explosives. Since then, the Bangor Annex has been used by the Navy primarily as an ammunition depot. In 1963, the Polaris Missile Facility, Pacific, was also established at the Bangor Annex. Since then, Polaris missiles and their nuclear warheads have been stored at Bangor and loaded on to ships to be transported to Guam Island.

115. The Trident Support Site will occupy 6,929 acres entirely within the 8,527 Bangor Annex. Prior to the start of Trident-related construction, the Bangor Annex was made up of administration and personnel support areas, a family housing area containing 57 units, industrial and production facilities, various types of magazines and barricaded sidings, marginal wharf outloading facilities, the Polaris Missile Facility, Pacific, and a number of small tenant facilities. Approximately, 1,000 naval personnel and civilian employees were employed at the Bangor Annex prior to the start of Trident-related construction.

116. Once construction is completed in 1981, the Trident Support Site will contain facilities necessary to support a 10-ship fleet of Trident submarines, including wharf and drydock facilities, missile assembly and storage areas, maintenance ships, material storage and handling facilities, training facilities, administrative, housing, medical and security facilities. The support site will eventually employ approximately 8,000 naval and civilian employees, and it will cost an estimated $550 million to construct.

117. In general, the schedule for construction of the facilities at Bangor has remained essentially the same from 1973

until the present, with a few minor adjustments involving the shifting of initiation of some of the projects or facilities within the broad categories from one fiscal year to another.

118. One project that did have its schedule altered is the Trident Training Facility. This facility is the most critical facility at the Bangor Site from a scheduling standpoint, since it is necessary to have it ready for training the crew for the submarines by January 1, 1977. A reanalysis in July, 1974 showed that in order to meet that date it was necessary to change the method of construction of the training facility. Instead of one contract for the facility, it was necessary to provide for construction in two phases: the first phase including site clearing, foundation, and advance procurement, and the second phase for construction of the remainder of the building. This phased construction resulted in commencement of construction late in October, 1974.

119. The planned initial operational capacity (IOC) for the Trident System is December, 1978. IOC is synonymous with the deployment of the first Trident submarine with its full complement of missiles. As a result of the abnormal inflation that has occurred during the current year, the operational date for the Trident I missile has been delayed six months. This has forced a slight delay in the initial deployment of the first Trident submarine from December, 1978 to April, 1979.

120. Despite this slippage of the Trident IOC, the major construction effort planned for the Trident refit site must proceed on the schedule originally planned. The Trident Training Facility at Bangor must be completed on schedule if crews are to be ready to man the second and succeeding Trident submarines. Because construction of the base is already behind schedule, the crews of the first submarine will have to be trained at the civilian shipyards.

121. At the present time there are five construction projects under way with an approximate value of $20 million. By the end of August, 1975, there are scheduled to be about 58 projects with a total value of about $95 million. There is a possibility of dredging an absolute maximum of 1,000 cubic yards involved in one contract, which is not scheduled until calendar year 1976.

122. For the contracts presently underway, delay costs would be about $300,000 per month, not including any escalation costs due to delays in follow-on contracts. The escalation costs are presently estimated at about 1.1 percent per month. A three month delay would thus result in a $1.3 million increase in costs due to escalation alone. A delay of over two months in the training facility presently under construction would result in an undeterminable cost resulting from the necessity to train crews for the submarine elsewhere. A delay of up to two months could be made up, but at an additional cost of up to $350,000.

123. The current estimated acquisition cost of the system is $16.153 billion of which $4.8 billion has been appropriated, $3.7 billion obligated, and $1.7 billion spent. Currently monthly disbursements are about $70 million.

## CONCLUSIONS OF LAW

### I. STANDING

 Defendants have challenged the standing of the plaintiffs to bring this action. There is no doubt that the plaintiffs have standing to sue in this case. The individual plaintiffs are property owners whose land is in the area of the Bangor Annex where the proposed Trident support facility will be constructed. Their interests in the environment of the area surrounding their properties are the kinds of aesthetic, conservational and recreational values recognized in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The organizational plaintiffs similarly possess standing to sue

under *Sierra Club* and *SCRAP*. The Supreme Court stated in *Sierra Club* that "it is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." 405 U.S. at 739, 92 S. Ct. at 1369. As in *SCRAP*, the organizational members here have alleged the same injury in fact to their members who reside in the Bangor area as did the individual plaintiffs, and this injury is sufficient to meet the first requirement for standing announced in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970) and *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). As for the second aspect of the twofold *ADAPSCO* test, it can hardly be gainsaid that the claims of both the individual and organizational plaintiffs are arguably within the zone of interests protected by NEPA. Therefore the plaintiffs in this suit have standing to sue on their claim that the federal defendants failed to comply with NEPA in selecting Bangor, Washington as the final site for the Trident support facility.

## II. LACHES

 Defendants raise the doctrine of laches as a defense to the complaint. This doctrine which focuses on the equity of permitting a claim to proceed to judicial resolution is essentially concerned with a delay by the plaintiff which induces a change in the defendant's position. Whether the doctrine of laches bars an action in any given case depends upon the circumstances of that case and is a question primarily addressed to the discretion of the trial court. *Burnett v. New York Central R. Co.*, 380 U.S. 424, 435, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965). *See Gardner v. Panama R. Co.*, 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951). The defense of laches "stems from the principle that 'equity aids the vigilant, not those who slumber on their rights,' and is designed to promote diligence and prevent en-

forcement of stale claims . . . To establish the defense the evidence must show both that the delay was unreasonable and that it prejudiced the defendant." *Powell v. Zuckert*, 125 U.S.App. D.C. 55, 366 F.2d 634, 636 (1966); *Duncan v. Summerfield*, 102 U.S.App.D. C. 185, 251 F.2d 896 (1957). Laches cases proceed on the assumption that "the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that because of the changing conditions or relations during this period of delay it would be an injustice to the latter to permit him to now assert them." *Galliher v. Cadwell*, 145 U.S. 368, 372, 12 S.Ct. 873, 874, 36 L.Ed. 738 (1892). Laches is not a mere matter of time, "but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties." *Id.* at 373, 12 S.Ct. at 875. Thus there are two essential elements of the doctrine of laches: lack of diligence by the plaintiff and injurious reliance thereon by the defendants. *Lathan v. Volpe*, 455 F.2d 1111, 1122 (9th Cir. 1972). The crucial issue of the first element, unreasonable delay, is knowledge, i. e., did the plaintiff knowingly sleep on his rights. *Ritter v. Rohm & Haas Co.*, 271 F.Supp. 313, 347 (S.D.N.Y.1967). As to the second element, injurious reliance by the defendant, there are two kinds of prejudice which would support a defense of laches: where the plaintiff's delay has resulted in a loss of evidence or unavailability of witnesses that would support defendant's position; and where the defendant has changed his position in a manner which would not have occurred if the plaintiff had not delayed. *Tobacco Workers Int. U. Local 317 v. Lorillard Corp.*, 448 F.2d 949, 958 (4th Cir. 1971). *See Powell v. Zuckert, supra*, 366 F.2d at

638. And laches does serve other purposes collaterally, if not directly, including minimizing the disruption and expense caused by granting certain relief. *Powell v. Zuckert, supra,* 366 F.2d at 638.

 The essence of plaintiffs' claim in this suit and the claims for which plaintiffs have standing to sue is that defendants failed to follow procedures mandated by NEPA in the development of the Trident system with respect to the selection of Bangor, Washington, as the final site for the Trident support facility. Plaintiffs allege that this selection was made prior to the preparation, distribution and filing of an environmental impact statement. This suit was filed on August 5, 1974. Defendants claim that all the facts necessary for the presentation of the issues in this suit had occurred when the selection of the Bangor site was made in February of 1973. However, by the defendants' own admission, "the announcement of the selection of Bangor was accompanied by a statement that no construction would be undertaken until a full analysis of the environmental impacts was made." (Def. Memo in Opp. to Prelim. Inj. at 2.) Furthermore, the draft EIS was released in March, 1974, and a public hearing at which the plaintiffs submitted comments was held in late April, 1974. The final EIS was filed on July 19, 1974, and, on August 22, 1974, the officer in charge of construction for Trident issued the order to proceed with procurement for the Trident support site at Bangor. (Def. Memo in Opp. to Prelim. Inj. at 7–8.) It is clear that no final administrative action reviewable in this Court occurred until at least July 19, 1974, when the final EIS was filed. This is not the case of a plaintiff sleeping on his rights, observing vast sums of public money being expended and substantial topographical changes being made as in *Iowa Student Public Interest Research Group v. Callaway,* 379 F. Supp. 714 (S.D.Iowa 1974) (where two-thirds of a dam construction project was complete before suit was filed) or in *Clark v. Volpe,* 342 F.Supp. 1324 (E.D.La.1972) aff'd 461 F.2d 1266 (5th Cir. 1972) (where plaintiffs stood idly by as a city park was stripped and levelled to build a highway). Nor is this a case where a lawsuit was filed seven and one-half months after an administrative decision was announced, during which time the project was 35 to 40 percent complete, as in *Smith v. Schlesinger,* 371 F.Supp. 559 (C.D.Cal.1974). The facts in the case *sub judice* are closer to those in *Committee To Stop Route 7 v. Volpe,* 346 F.Supp. 731 (D.Conn.1972), where only one segment of a proposed highway had been constructed and that segment had utility independent of the entire proposed highway. Defendants in that case had failed to prepare a detailed EIS and conceded that their proposal was a major federal activity significantly affecting the environment. The District Court in *Route 7* concluded that no irrevocable action concerning the projects had been taken, no other construction had occurred and no other contract rights had vested when the suit was filed. Thus the Court entered an injunction against further action until the requirements of NEPA were met. The Navy itself admitted, subsequent to the filing of this suit, that its actions with respect to the Bangor site "have not and do not constitute an irreversible commitment to the proposed action." (Memorandum of Capt. E. R. Stacey, USN, Def. Ex. 11 to Answer). Plaintiffs further support their claims of diligence with the evidence that, in their communications with Navy officials managing the Trident program and Members of Congress, they were given the impression that all departments were complying with NEPA as it affected the Trident support site proposal. The Navy's own fact sheet (Ex. A. to Sive affidavit filed January 13, 1975) dated August 8, 1973, indicates ongoing environmental studies with respect to the Bangor site. Furthermore, letters from members of CAT to Navy officials in the Trident project and from Navy offi-

**480**

cials to Senator Edward M. Kennedy and from concerned citizens to their elected representatives in Congress clearly show that plaintiffs did not sleep on their rights but were assured that compliance with NEPA was being accomplished in decisions made on the Bangor site. (See Exs. B, C, and D to Sive affidavit, filed January 13, 1975.)

Under these facts and circumstances, it is obvious that the plaintiffs were diligent in asserting their rights. Their awaiting final administrative action in the form of a final EIS before seeking judicial review is understandable in light of the requirements of administrative law. In fact, a suit filed prior to the filing of the final EIS would have been premature. Therefore, this action is not barred by the doctrine of laches.

## III. THE SUBSTANTIVE DECISION TO PROCEED WITH TRIDENT

█ Plaintiffs challenge as arbitrary Defendants' actions with respect to determinations designated by Plaintiffs as the major Trident actions. These major Trident actions include the actions and determinations first, to develop the Trident system; second, to proceed with it on an accelerated basis; third, to operate Trident from a dedicated base; and fourth, to construct that dedicated base at Bangor, Washington. Plaintiffs claim that Defendants did not carry out their duty to execute and administer the laws with which they are charged in accordance with the policies set forth in NEPA. This is essentially a claim that the Secretary of Defense and the Secretary of the Navy did not give adequate consideration to the goals and policies of NEPA set forth in Section 101, the substantive portion of the Act, 42 U.S.C. § 4331 (1970). Section 101 is the flexible portion of NEPA. It "leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." *Calvert Cliffs Coordinating Committee v. U. S. Atomic Energy Commission,* 146 U.S.App.D.C.

33, 449 F.2d 1109, 1112 (1971). Section 101, in effect, "sets out specific environmental goals to serve as a set of policies to guide agency action affecting the environment," *Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 297 (8th Cir. 1972), and declares NEPA's basic substantive policies, *Environmental Defense Fund v. Tennessee Valley Authority,* 486 F.2d 1164, 1174 (6th Cir. 1972). In essence section 101 charges federal officials with the responsibility to incorporate the consideration of environmental factors into the decision-making process. *Id. See Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412, 419 (2d Cir. 1972).

█ The NEPA standard of review to be applied to the substantive DOD–Navy decision to proceed with the Trident system is whether or not "the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values." *Calvert Cliffs, supra,* at 1115. *See Life of the Land v. Brinegar,* 485 F.2d 460, 469 (9th Cir. 1973). And as to this substantive decision to proceed with the Trident Program, the Court may not substitute its judgment for that of the Secretary of Defense and the Secretary of the Navy as to the necessity or desirability of the Trident Program. *See Jicarilla Apache Tribe v. Morton,* 471 F.2d 1275, 1279 (9th Cir. 1973); *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 353 (8th Cir. 1972); *Hanly v. Mitchell,* 460 F.2d 640, 643 (2d Cir. 1972). The question for judicial review is not whether the proposed project has merit as an agency program but whether the requirements of NEPA have been met in the decision-making process creating the program. The focus of the Court must be on the decision-making process by which the Department of Defense and the Department of the Navy arrived at the conclusions which resulted in acceptance by them of the Trident Program. Thus the two basic areas of inquiry are

whether these agencies acted within the scope of their authority and whether their decision was arbitrary, capricious or otherwise not in accordance with law. In the substantive NEPA review context, the Court must examine particularly whether the Trident decisions were made without due concern for the substantive environmental considerations outlined in Section 101(b) of NEPA. In this regard it is important to note that Section 101(b) of the Act states that agencies have an obligation "to use all practicable means, *consistent with essential considerations of national policy,* to improve and coordinate Federal plans, functions, programs, and resources" to preserve and enhance the environment. 42 U.S.C. § 4331(b) (1970). *See Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 297 (8th Cir. 1972). Moreover, NEPA plainly commits the preliminary determinations such as whether or not the proposal will have a significant effect on the environment to the agencies. *Citizens for Reid State Park v. Laird,* 336 F.Supp. 783, 789 (D.Me.1972).[1] The District Court in *Reid State Park* stated the courts' role succinctly:

"The standard of review in such cases is limited; for in the language of the Supreme Court: 'Where the Congress has provided that an administrative agency initially apply a broad statutory term to a particular situation, our function is limited to determining whether the [agency's] decision has 'warrant in the record and a reasonable basis in law.' *Atlantic Refining Co. v. F[ederal] T[rade] C[ommission],* 381 U.S. 357, 367, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443 (1965), citing *National Labor Relations Board v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851,

88 L.Ed. 1170 (1944)." 336 F.Supp. at 789.

It has been held that NEPA does create substantive rights.[2] Clearly, NEPA was intended to effect substantive changes in the Federal agency decision-making process. The Eighth Circuit so held in *Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 297 (8th Cir. 1972):

"Section 101(b) of the Act states that agencies have an obligation 'to use all means consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources' to preserve and enhance the environment. To this end, § 101 sets out specific environmental goals to serve as a set of policies to guide agency action affecting the environment.

"Section 102(1) directs that the policies, regulations and public laws of the United States be interpreted in accordance with these policies to the fullest extent possible. Section 102(2), of course, sets forth the procedural requirements of the Act . . . . The purpose is to 'insure that the policies enunciated in section 101 are implemented.' S.Rep. 91–296, 91st Cong., 1st Sess. 19 (1969). The procedures included in § 102 are not ends in themselves. They are intended to be 'action forcing.' "

The issue of whether NEPA creates substantive rights is not vital to this Court's decision since the resolution of the Trident issues turns on whether or not the DOD–Navy decision-making process adequately took into account environmental factors and ramifications. This environmental consideration is clearly a right guaranteed by NEPA.

1. For relevant factors to be considered by federal agency in determining whether its action will significantly affect the environment. See, *Hanly v. Kleindeinst,* 471 F.2d 823, 830–31 (2d Cir. 1971), *cert. denied* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

2. *Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 297 (8th Cir. 1972); *but see McQueary v. Laird,* 449 F.2d 608, 612 (10th Cir. 1971).

Courts, of course, have an obligation to review substantive agency decisions on the merits when their compliance with NEPA is questioned, and this prospect of substantive review is likely to make agency decisions more consistent with NEPA's purposes. This substantive review is, as indicated in *Calvert Cliffs, supra,* at 1115, a limited one involving the actual balances of costs and benefits measured against an arbitrary/capricious standard to determine whether environmental factors were considered in the decision.

 An explication of the "arbitrary, capricious or otherwise not in accordance with law" standard is set forth in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and, while not a NEPA case, the Supreme Court offers in *Overton Park* a guideline which applies to review of substantive agency decisions under statutes, including NEPA. The reviewing Court must first determine whether or not the agency acted within the scope of its authority. Thus in the case at bar we *must examine first the scope of DOD–Navy authority and discretion* with respect to the Trident Program. The authority to make the decision to proceed with the Trident program is clearly within the scope of authority of the Secretary of Defense and the Secretary of the Navy. *See* 10 U.S.C. § 5031 (1970). Under this statute the Secretary of the Navy has the responsibility of administering the Department of the Navy under the "direction, authority and control of the Secretary of Defense." 10 U.S.C. § 5031(a) (1970). Furthermore, this statute charges the Secretary of the Navy with the duty to "execute such orders as he receives from the President relative to—(1) the procurement of naval stores and material; (2) the construction, armament, equipment, and employment of naval vessels." 10

U.S.C. § 5031(b) (1970).[3] It is beyond question that the Trident decisions fall within the subject matter embraced by this statute. Furthermore, as the courts indicated in *McQueary v. Laird,* 449 F. 2d 608, 612 (10th Cir. 1971) and *Nielson v. Seaborg,* 348 F.Supp. 1369, 1372 (D. Utah 1972), substantive decisions relating to the national defense and national security lie within that narrow band of matters wholly committed to official discretion both because of the delicate security issues they raise and the constitutional delegation of those concerns to the political departments of our government. These are the political questions the Supreme Court described in *Baker v. Carr,* 369 U.S. 186, 211, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The substantive decision to proceed with Trident as a top priority national defense measure meets all the requirements spelled out in the *Baker* decision. There is a "textually demonstrable constitutional commitment" of the conduct of national defense to the Congress in Article I, § 8, and the President in Article II, § 2. Secondly, the courts are not the proper forum for debate on national security and defense issues. Third, the policy determination to proceed with a particular approach toward national defense is not within the ambit of the court's expertise or discretion, and, if so undertaken, would be a usurpation of the powers of the Congress and the President who have the duty under the Constitution to develop such policies. Fourth, in light of ongoing international arms limitation negotiations and the large amounts of money already invested in this particular national defense program, there exists an unusual need for adherence to the Trident choice. Indeed, a judicially imposed variance from this decision would very likely have negative international repercussions. This is not to say that *the courts cannot inquire into the facts* of such decisions to see that all applica-

---

3. In concert with the constitutional power granted to the Congress by article I, § 8, to provide and maintain a navy, a legal basis is established for the administration, operation and funding of the Navy.

ble laws were complied with. Rather it is to say that the substantive decision to choose one alternative of national defense over another lies with the political branches of government and not with the courts. *See Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Co.,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *Pauling v. McNamara,* 118 U.S.App.D.C. 50, 331 F.2d 96, 798–99 (1963), *cert. denied* 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964); *Massachusetts v. Laird,* 451 F.2d 26, 31 (1st Cir. 1971). And courts must not upset this constitutional balance unless the decision was reached arbitrarily or without due regard for procedural requirements.[4]

■■ This Court concludes as a matter of law that the substantive decision to choose Trident as a national defense system was within the discretion of the Secretary of Defense and the Secretary of the Navy and no evidence in the record indicates that this was an arbitrary choice. Indeed, other systems were considered, such as the ultra-hard silo missile defense system and the long-range bomber system, but the Trident system was chosen to complement and strengthen these. It is not for this Court to second-guess the wisdom of that selection when those officials entrusted with the decision acted within their discretionary authority. Choices other than the dedicated site concept, where all support facilities are placed at one location, were considered and rejected on the basis of efficiency and deterrent capability. This is not arbitrary when the vital nature of this particular weapon system is viewed in light of its priority in and necessity for our national defense as a nuclear deterrent. Further, sites other than Bangor, Washington were considered, and the strategic value of a Pacific base was determined to outweigh the environmental costs that would result from locating the Trident base at Bangor. Other Pacific sites were considered and rejected because of excessive cost, general unsuitability and for strategic reasons. This cannot be characterized as arbitrary, particularly in light of the existing naval facility at Bangor. Moreover, the background of continued funding from the Congress for the Trident program reinforces the notion that this effort is supported by both political branches of our government, those ultimately charged with responsibility for this nation's defense and survival.

■ Secondly, under the *Overton Park* rule and Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the facts require a finding that the actual choice made was not arbitrary, capricious or otherwise not in accordance with law. To make this finding the Court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. In this regard, as stated before, the Court's inquiry is a narrow one and courts are not empowered to substitute their judgment for that of the agency. Within the *Overton Park* framework, substantive review of the merits under NEPA must determine first, whether the agency reached its decision after a full, good faith consideration and balancing of environmental factors and second, under the standards set out in Section 101(b) and 102(1) of the Act, whether the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight

4. As the Court of Appeals for this Circuit stated in *Curran v. Laird,* 136 U.S.App.D.C. 280, 420 F.2d 122, 131, 1969:

"... our decision does not contradict the principle that even where an official action is of a type which generally involves the exercise of discretion the court has power to inquire into a claim of abuse of discretion, or use of procedurally unfair and unauthorized techniques, inflicting injury on private citizens." [Citing *Overseas Media v. McNamara,* 128 U.S.App.D.C. 48, 385 F.2d 308, 316–18 (1967); *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570 (1964).]

to environmental factors. *Environmental Defense Fund v. U. S. Army Corps of Engineers*, 470 F.2d 289, 300 (8th Cir. 1972).[5] These two determinations along with the initial determination of scope of authority satisfy the requirements for substantive review of agency decisions as set out in *Overton Park*.[6]

 With respect to the consideration of environmental factors and the balance of costs and benefits, it is important to bear in mind that there are peculiar aspects of national defense decisions which distinguish in some measure the nature of compliance with NEPA.[7] It is important to recognize that, from a substantive NEPA review aspect, agency decisions dealing with the national defense and survival will, of necessity, be made with a different view toward environmental considerations and, indeed, most other considerations, than will non-defense related agency decisions. This is not to say that the Defense Department may ignore the environment. Rather, this is a recognition that national defense is a unique area and, while bound by NEPA's policies in Section 101(b), proper judicial review can only examine the substantive decision under the arbitrary/capricious standard. It is also a realization that some changes, even major changes, in the environment may be required for the survival of the Republic. *See Nielson v. Seaborg*, 348 F.Supp. 1369, 1372 (D.Utah 1972). In light of the long run development of the Trident system and the present state of

nuclear capabilities and operational necessities, it cannot be said that the substantive decision to proceed with Trident was arbitrary, capricious or an abuse of discretion. The costs environmentally are minute when compared with the benefits to the national defense and security. The Trident Program is essentially a continuation of the present nuclear submarine program. While it will have environmental effects, particular in Kitsap County, these do not outweigh the demands placed on the Department of Defense and the Department of the Navy for the security of the Republic. There is no evidence in the record that, as to the substantive Trident decisions, the officials gave insufficient weight to environmental values. As previously stated, there is evidence that alternatives to the submarine launched ballistic missile (SLBM) were considered, such as the ultra-hard silo and the long-range bomber and it was determined that these plus SLBM were essential for the defense for this country. There is also evidence that alternatives to the dedicated site were carefully and extensively considered. Use of training, missile handling and refit facilities at different locations was considered and rejected because such an approach would diminish Trident's potential as a nuclear deterrent such that its efficacy would be seriously jeoparized. Training, missile handling and refit facilities at different localities would mean the time at sea of Trident submarines would be materially

5. *See Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 353 (8th Cir. 1972); The *Conservation Society of Southern Vermont v. Secretary of Transportation*, 362 F. Supp. 627, 632–33 (D.Vt.1973).

6. The CEQ itself has recognized the limited nature of substantive review of agency decision-making under NEPA. In its Third Annual Report issued in 1972 the CEQ stated: "NEPA commands firmly that an agency must to the fullest extent possible, take environmental values into account. It must also prepare environmental impact statements for major actions significantly affecting the quality of the human environment. If an agency fails to do either,

it can be ordered to comply by a court. But neither NEPA's substantive duty nor its 102 process purports to dictate the agency's course of action in particular situations. The courts have uniformly said that, after an agency has considered environmental effects, its decision to act is subject to the limited judicial review afforded by the traditional arbitrary or capricious and substantive evidence tests." Environmental Quality, 253–54 (August, 1972).

7. For example, as the *McQueary* court stated, "Public disclosure relating to military-defense facilities creates serious problems involving national security." 449 F.2d at 612.

reduced, with a consequent material reduction in their deterrent effectiveness. Further, the consideration of other sites for a dedicated base was rejected, not for arbitrary reasons but rather because the effectiveness of this primary defense system required its deployment in the Pacific Ocean and there were no other sites on the Pacific Coast as ·suitable as Bangor. While it is true that these are not environmental considerations, it is also true that the Secretary of Defense and the Secretary of the Navy are charged with the defense of this nation. While they must not ignore the environment in so doing, neither may they abdicate their primary responsibilities. NEPA, of course, does not require such abdication; it only demands that environmental factors be accorded consideration in substantive agency decisions. *See Jones v. D. C. Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 499 F.2d 502, 512 (1974).[8]

Furthermore, the Trident System is not one which causes outright or even subtle degradation of the environment. Doubtless it will cause changes in the character of Bangor, Washington. But the choice of Bangor was not one which flew in the face of environmental values. It was the result of a thoughtful consideration of strategic, technical and logistical necessities which took account of environmental factors. It is also significant that the site chosen is presently a naval facility which does not require vast change in the land or natural waterway.

Therefore, this Court concludes as a matter of law that the decision-making process was not arbitrary or capricious and Section 101(b) of NEPA was not violated by the decision-making processes which gave birth to the Trident system.

■ The third and final inquiry under *Overton Park* is whether the agency followed the necessary procedural requirements. This subject will be discussed in connection with the sufficiency of DOD—Navy compliance with Section 102 of NEPA, since the framework of NEPA is such that compliance with the substantive portion, Section 101, essentially requires compliance with the procedural portion of the statute, Section 102.[9]

## IV. SUFFICIENCY OF THE TRIDENT ENVIRONMENTAL IMPACT STATEMENT

Plaintiffs have charged that the Defendants are required ˙by Section 102(2)(C) of NEPA to prepare and circulate a detailed environmental impact statement for each of the four major Trident actions referred to earlier. They also charge that the Draft Environmental Impact Statement (DEIS) and Final Environmental Impact Statement (FEIS) prepared for the Bangor site of the proposed Trident support facility are defective and insufficient as a matter of law. The laws and regulations allegedly violated by the defendants are NEPA, 42 U.S.C. § 4321 *et seq.* (1970); section 309 of the Clean Air Act Amendments of 1970, 42 U.S.C. § 1857h–7 (1970); and the applicable regulations of the Council on Environmental Quality (CEQ) (35 Fed.Reg. 7390–

8. In *Jones*, the Court of Appeals for this Circuit stated:
 ". . . NEPA was intended to ensure that decisions about federal actions would be made only after responsible decision-makers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs. Thus, the harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates." 499 F.2d at 512.

9. *See Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972) (even under the arbitrary or capricious standard of review, it is arbitrary or capricious for an agency not to take into account all relevant factors in making its determination).

7393, 36 Fed.Reg. 7724–7729, and 38 Fed.Reg. 10859); the Department of Defense (DOD), 36 Fed.Reg. 15750, 36 Fed.Reg. 31645, 39 Fed.Reg. 14699); and the Department of the Navy (Navy), OPNAVINST. 6240.2B; 6240.2C and 6240.2D. Plaintiffs seek a declaration that Defendants' decision-making processes with respect to the Trident program are contrary to those required by law. Specifically, Plaintiffs seek a declaration that the Defendants are required by section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1970), to prepare and circulate a detailed environmental impact statement for each of the four major Trident actions and a declaration that the Draft and Final Environmental Impact Statements for the Trident support site at Bangor are defective and insufficient as a matter of law. Finally, Plaintiffs seek to enjoin the Defendants from proceeding with construction and preparation of the dedicated site at Bangor and to require that Defendants further study and determine the environmental effects of their proposed actions and the development of alternatives to that action.

▆▆ NEPA creates basically two sets of policies and requirements. The first is the substantive policy of Section 101 discussed earlier. This is the flexible aspect of the Act and the standard of judicial review is a strict one. Agency decisions attacked under section 101 may only be examined by the courts under the arbitrary/capricious standard. However, Section 102 of NEPA, 42 U.S.C. § 4332 (1970), is more demanding than Section 101, and a more demanding standard of judicial review applies to agency actions challenged under that section. As the court in *Calvert Cliffs, supra,* stated, Section 102 contains "very important 'procedural' provisions—provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance." 449 F.2d at 1112.

Herein lies NEPA's greatest impact for it makes environmental protection the mandate of every Federal agency and requires all agencies to "consider environmental issues just as they consider other matters within their mandates." *Id.* Environmental goals often conflict with economic and technical factors, and the consideration of these factors together demands, of course, a balancing process. While there are inevitably times when each set of considerations outweighs the other, NEPA requires in all cases a "rather finely tuned and 'systematic' balancing analysis." *Calvert Cliffs, supra,* at 1113. Senator Jackson, NEPA's principle advocate in the Congress, clearly recognized this balancing requirement when he said:

> "Subsection 102(b) requires the development of procedures designed to assure that all relevant environmental values and amenities are considered in the calculus of project development and decision making. Subsection 102(c) establishes a procedure designed to insure that in instances where a proposed major federal action would have a significant impact on the environment that the impact has in fact been considered, that any adverse effects which cannot be avoided are justified by some other stated consideration of national policy, that short term uses are consistent with long term productivity, and that any irreversible and irretrievable commitments of resources are warranted." 115 Cong. Rec. (Part 21) 29055 (1969).

Section 102(2)(C) requires that responsible officials of all agencies prepare a "detailed statement" concerning the impact of proposed actions on the environment to ensure that the balancing analysis is executed. This detailed environmental impact statement must include consideration of any adverse environmental effect which cannot be avoided, alternatives to the proposed action, the relationship between short term uses of the environment and

enhancement of long term productivity, and any irreversible and irretrievable commitments of resources involved in the proposed action. 42 U.S.C. § 4332(2)(C)(i–v) (1970). The purpose of the impact statement is "to aid in the agencies' own decision making process and to advise other interested agencies and the public of the environmental consequences of planned Federal action." *Calvert Cliffs, supra,* at 1114. Section 102(2)(D) requires all agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts cncerning alternative uses of available resources." *Id.* This requirement seeks to provide agency decision-makers with all possible approaches to the project before them, including abandonment of the project. Hopefully, these two sections, 102(2)(C) and 102(2)(D), will result in the making of intelligent and beneficial decisions. Furthermore, the two sections provide for evidence of the NEPA mandated decision-making process and independent evaluation of the decisive factors. *Id.* It is important to bear in mind that all duties embodied in Section 102 are qualified by the phrase "to the fullest extent possible." As the Court of Appeals for this Circuit said in *Calvert Cliffs, supra,* at 1114–1115:

> We must stress as forcefully as possible that this language does not provide an escape hatch for foot-dragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts . . . .

Thus the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of statutory authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance. We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decision making process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse."

▮▮▮▮ The test of compliance with Section 102 is one of good faith objectivity rather than subjective impartiality. *Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 296 (8th Cir. 1972). As the Court of Appeals for the Tenth Circuit stated in *National Helium Corp. v. Morton,* 486 F.2d 995, 1001 (10th Cir. 1973):

> The better reasoned decisions have required an objective good faith effort to comply with the statutory procedural requirements. Other than that, the courts have demanded that the agency do more than mechanically pursue the procedural standards. Thus, in *Calvert Cliffs . . .* the court added to the good faith standard by saying that the agency must comply with the procedural requirements to the fullest extent possible. The same Circuit in *National Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), has said that the procedural requirements are not intended to be a strait jacket or to demand what is, fairly speaking, not meaningfully possible.

The Court of Appeals for this Circuit has laid out the standard of review of agency compliance with NEPA rather clearly in *Scientists Institute for Public*

*Information, Inc. v. Atomic Energy Commission*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092 (1973):

"Accordingly, if the Commission's environmental survey is prepared and issued in accordance with NEPA procedures, and if the Commission makes a good faith effort in the survey to describe the reasonably foreseeable environmental impact of the program, alternatives to the program and their reasonably foreseeable environmental impact, and the irreversible and irretrievable commitment of resources the program involves, we see no reason why the survey will not satisfy the requirements of Section 102(c)."

The standard of review to be applied to the sufficiency of the Trident environmental impact statement is whether or not the Department of Defense and the Department of the Navy, in accordance with Section 102 of NEPA, made the decision to proceed with the Trident program with an "individualized consideration and balancing of environmental factors—conducted fully and in good faith." *Calvert Cliffs, supra*, at 1115. The application of this "good faith objectivity" standard requires an examination of the judicial constructions of the various NEPA requirements for an adequate environmental impact statement. In this inquiry the court must focus on whether the procedural requirements of Section 102 of NEPA were met with good faith objectivity rather than subjective impartiality. *Environmental Defense Fund v. U. S. Army Corps. of Engineers*, 470 F. 2d 289, 296 (8th Cir. 1972). In this regard, Senator Jackson's remarks in explaining the bill are helpful:

Subsection 102(c) (now 102(2)(c)) establishes a procedure designed to insure that in instances where a proposed major federal action would have a significant impact on the environment that the impact has in fact been considered, that any adverse effects which cannot be avoided are justified by some other stated consideration of national policy, that short-term uses are consistent with long term productivity and that any irreversible and irretrievable commitments of resources are warranted. 115 Cong.Rec. 29055 (October 8, 1969).

In determining the sufficiency of the environmental impact statement, the rule of reason applied in *Natural Resources Defense Council, Inc. v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (1972), must prevail and NEPA must be construed in its light.

 It is undisputed that NEPA applies to all federal agencies, including the Department of Defense and its armed forces components. *Calvert Cliffs Coord. Comm. v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1111 (1971); *McQueary v. Laird*, 449 F.2d 608, 612 (10th Cir. 1971); *Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412, 418 (2d Cir. 1972); *Environmental Defense Fund v. U. S. Army Corps of Engineers*, 470 F.2d 289, 294 (8th Cir. 1972); *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164, 1173 (6th Cir. 1972); *Bradford Township v. Illinois State Toll Authority*, 463 F.2d 537, 539 (7th Cir. 1972); *Zabel v. Tabb*, 430 F.2d 199, 211 (5th Cir. 1970); *Citizens for Reid State Park v. Laird*, 336 F.Supp. 783, 786, 788 (D.Me.1972). In the *McQueary* and *Reid State Park* cases, NEPA was applied specifically to the Department of Defense and its armed forces components. With this premise established, we will proceed to a discussion of NEPA requirements with respect to environmental impact statements. NEPA requires all agencies to use a " 'systematic, interdisciplinary approach' to environmental planning and evaluation 'in decisionmaking which may have an impact on man's environment.' " *Calvert Cliffs, supra*, at 1113. The *Calvert Cliffs* decision laid out the requirements of NEPA's Section 102(2):

To ensure that the balancing analysis is carried out and given full effect, Section 102(2)(C) requires that re-

sponsible officials of all agencies prepare a 'detailed statement' covering the impact of particular actions on the environment, the environmental costs which might be avoided, and the alternative measures which might alter the cost-benefit equation. The apparent purpose of the 'detailed statement' is to aid in the agencies' own decision-making process and to advise other interested agencies and the public of the environmental consequences of planned federal action. Beyond the 'detailed statement,' Section 102(2)(D) requires all agencies specifically to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.' This requirement, like the 'detailed statement' requirement seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decisons will be made. Moreover, by compelling a formal 'detailed statement' and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own. *Calvert Cliffs, supra,* at 1114.

Thus, in Section 102 NEPA establishes a framework for decision-making in major federal actions which requires a detailed statement of the environmental consequences of the proposed action and a studied consideration of alternatives to the proposal. Essentially, this requires agencies to give environmental issues a "hard look" before making decisions. As the Circuit Court stated in *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972):

"So long as the officials and agencies have taken the 'hard look' at environmental consequences mandated by Congress, the court does not seek to impose unreasonable extremes or interject itself within the area of discretion of the executive as to the choice of the action to be taken."

This Court is of the opinion that the Secretary of Defense and the Secretary of the Navy took that hard look at the environmental consequences of the Trident program. The final EIS is a balanced presentation of the effects Trident will cause and the record indicates that environmental considerations pervaded the decision-making process. Compliance with the procedural aspects of NEPA was accomplished.

Plaintiffs have challenged that the federal Defendants ought to have prepared an environmental impact statement for the Trident program as a whole. Their main support for this argument is the decision in *Scientists' Institute for Public Information, Inc. v. U. S. Atomic Energy Commission,* 156 U.S. App.D.C. 395, 481 F.2d 1079, 1087 (1972). Plaintiffs have also cited to the Court the decision in *Natural Resources Defense Council v. Morton,* 148 U.S. App.D.C. 5, 458 F.2d 827, 835 (1972). Yet in each of these cases the agency program was a broader one than that proposed by the Department of Defense and the Navy in this suit. The *Scientists' Institute for Public Information Inc.* case dealt with the Atomic Energy Commission's liquid metal fast breeder reactor program (LMFBR), a concept with vast ramifications for the human environment of this country. The LMFBR represented the development of a technology which could affect the environment of this entire nation. Furthermore, the language of the court in *Natural Resources Defense Council v. Morton, supra,* speaks in terms of a "national problem, or a set of inter-related problems" which "may call for each of

several departments or agencies to take a specific action" when it describes the broad agency program which necessitates an environmental impact statement. 458 F.2d at 835. The elements of the broad agency programs enunciated in these cases are not present in the Trident program. Trident is, first of all, essentially a DOD program. Second, it is not national in scope. The manifestations of Trident will not be spread over either a large geographic area or a large number of people. Third, Trident is a continuation of the current Polaris/Poseidon nuclear submarine program. As such, its presence is not likely to have any significant effect on the environment nationwide. Trident will have a localized and particularized impact on the environment in the Bangor area. Thus it is in accord with the goals of NEPA to compose environmental impact statements for those specific instances where Trident will have a significant effect on the environment. The DOD–Navy Trident program, as distinguished from its components, does not have an effect on the environment significant enough to require an impact statement. In any event, if such a task were undertaken, it would, of necessity, break down into assessments of the impact of Trident's components, and these studies were accomplished.

Plaintiffs have also charged that there was an acceleration of the Trident timetable and that this was a federal action which required an environmental impact statement. Initial objectives in 1968 contemplated an operational Trident submarine in late FY 1976 with the potential to accelerate that capability to FY 1975 should the threat so dictate. This initial operating capability was adjusted several times, varying from FY 1975 to sometime in the early 1980's. In December of 1971, the Secretary of Defense designated 1978 as the required operational date, and this was the first firm date set for Trident's operational capability. It does not appear to the Court that this kind of decision, by its

nature adjustable and frequently adjusted because of its numerous and complex aspects, was contemplated by Congress to require an environmental impact statement. The Trident timetable is perforce flexible. It depends on the gravity of the threat to which Trident responds, the age and condition of the vessels Trident will replace, the levels of funding provided by the Congress and inflation. This flexibility is evident in the Trident schedule. Trident will make no sudden appearance in Bangor; it will be phased in over several years. This gradual development is likely to ameliorate any adverse effects caused by a perceived change in the Trident timetable. In any event, it has not been shown that the present Trident schedule affects the environment in any way significantly different from the original timetable, and thus does not require an impact statement.

■ Lastly, Plaintiffs challenge the sufficiency of the environmental impact statement prepared for the proposed Trident support facility at Bangor, Washington. As mentioned previously, the standard for review of the sufficiency of an environmental impact statement is the "good faith objectivity" standard —whether the EIS for the Trident support facility represented an "individualized consideration and balancing of environmental factors—conducted fully and in good faith." *Calvert Cliffs, supra,* at 1115. *See National Helium Corp. v. Morton,* 486 F.2d 995, 1001 (10th Cir. 1973). Superimposed on this standard must be the standard of reasonableness enunciated in *Natural Resources Defense Council v. Morton:*

"The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite." 458 F.2d at 837.

The adequacy of the Trident EIS must be tested by the five prescribed areas of

Section 102(2)(C) of NEPA. *National Helium Corp. v. Morton,* 486 F.2d 995, 1003 (10th Cir. 1973). And it must be more than a catalog of environmental facts. The agencies must explicate fully the course of their inquiries, their analyses and the reasoning supporting their statements. *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 351 (8th Cir. 1972); *Ely v. Velde,* 451 F.2d 1130, 1139 (4th Cir. 1971). It is a helpful guideline in reviewing environmental impact statements to recall that the purpose of Section 102 is to ensure that the policies of Section 101 are implemented. *Environmental Defense Fund v. U. S. Army Corps of Engineers,* 470 F.2d 289, 297 (8th Cir. 1972). The Trident environmental impact statement meets the "good faith objectivity" standard. The statement is a reasonable explication of the reasons behind the choice of a dedicated base at Bangor and the environmental consequences flowing from that selection.

 Plaintiffs challenge the timing of the final EIS for the Bangor site. They have charged that the decision to place the support site at Bangor was made irrevocably in February of 1973, prior to the issuance of the final EIS in July of 1974. The evidence demonstrates, however, that this site selection was conditioned on an environmental study (i. e., the final EIS), which revealed no drastic environmental consequences. Common sense dictates that in any project a tentative decision on a particular proposal must be made before a final EIS can be prepared fully exploring its ramifications. Such was the case with Trident. Preliminary studies had been conducted for the four final site choices and an environmental study for a typical Trident support facility had been prepared. It is clearly reasonable to make a final site selection and to condition acceptance of that site on a subsequently prepared environmental impact statement. This was the course the Navy chose with the Trident program and it was a reasonable and proper one.

Plaintiffs have further made a number of challenges to particular aspects of the final environmental impact statement for the Trident support site at Bangor. They claim that there is no detailed statement of impacts with respect to the decision to operate Trident from a dedicated base, nor is there a detailed statement concerning alternatives to a dedicated site. There is no merit in this allegation. The decision to operate Trident from a dedicated site is discussed in a detailed manner which emphasizes the vital need for high availability of the submarine for patrol. The final EIS presentation on this issue is adequate to show the necessity for a dedicated base for the Trident submarine, and the reasons why alternatives to a dedicated base would not permit the high time at sea so necessary to Trident's mission. Plaintiffs argue that the final EIS fails to identify and analyze Trident's impact in areas outside Kitsap County where the Bangor site is located. While at first blush it might appear that this subject could have been presented in greater detail, it is also true and is so stated in the EIS that the impact of Trident outside Kitsap County is difficult to predict at this stage in Trident's development. Many of the forces which will have an effect outside Kitsap County are impossible to predict and will not reveal themselves until the Bangor base is actually operational. In preparing environmental impact statements, agencies need not foresee the unforeseeable. NEPA requires only reasonable forecasting. *See Scientists Institute for Public Information, Inc. v. U. S. Atomic Energy Commission, supra,* at 1092. In this same vein, Plaintiffs also attack the fact that the final EIS did not discuss the possible deployment of more than 10 submarines. A 20-ship fleet was discussed in preliminary technical studies. However, there have been no Congressional appropriations nor are there any foreseeable plans for such an increment. The rule of reasonable forecasting applies to this charge also; the 10-boat complement is planned and any increase in that number is too re-

mote a possibility at this time to warrant a detailed impact statement. The rule of reason expressed in *Natural Resources Defense Council, Inc. v. Morton, supra,* similarly applies to Plaintiffs' contention that the final EIS was defective in that it did not discuss the early termination of the Trident program. Early termination of this program is simply not a realistic possibility. The Court has no doubt that, with the existing climate of international affairs and the investment already made, the Trident program will not be terminated until its planned life has expired.

Plaintiffs also challenge the Trident final EIS for Bangor by alleging that its forecasts extend only to 1981. There is significant indication in the EIS that studies were prepared for 1983 and, in any event, 1981 is not an unreasonable date for the purpose of impact studies. In 1981 it is expected that 80% of the military employees and 100% of the civilian employees will be on the job at the Bangor base. Thus it would appear that the significant effects caused by Trident will have occurred almost in whole by 1981. Plaintiffs charge also that the various disciplines were not correlated in the EIS. This allegation is without merit. An interdisciplinary team was assembled for each of the Trident Joint Venture's tasks: environmental impact analysis, master planning and preliminary engineering. This approach assured that environmental considerations would be an essential element of the master planning and engineering decisions. Plaintiffs' allegation that the final EIS on the Bangor site fails to make use of environmental, economic and social data prepared by local Washington organizations is without merit. An ad hoc community task force, composed primarily of elected officials from the local governments, was established early in the program's development. This task force was later designated the Kitsap County TRIDENT Coordinating Committee and its membership was expanded to include non-elected community representatives. Navy officials have regularly met with this group and exchanged information. Furthermore, data received through the written public comments was incorporated in the final EIS for Bangor. Plaintiffs claim that the EIS also fails to consider radioactive hazards, air quality and water quality. All of these considerations are more than adequately discussed in the EIS. Similarly the impact of urbanization is discussed sufficiently in the sections dealing with social and economic impact. Such aspects as demography, population characteristics, housing, health and social services, education, recreation and cultural needs are examined adequately. Public services, transportation, visual quality impact, air quality impact, water resources and geologic effects, impacts on fauna and flora, noise effects, public utility needs and ameliorative efforts with respect to all of the impacts are described in sufficient detail to satisfy the requirements of Section 102(2)(C) of NEPA. Moreover, there is no effort in the final EIS for the Bangor base to minimize the unavoidable adverse impacts on the environment. These are discussed in a straightforward manner. The overall effect of this environmental impact statement is to describe and analyze the Trident Program and all of the aspects which will affect the Bangor area. The Court concludes as a matter of law that a final EIS on the Bangor site comports with the requirements of NEPA.

## IV. COMPLIANCE WITH THE CLEAN AIR ACT AMENDMENTS

 Finally, Plaintiffs allege a violation of section 309 of the Clean Air Act Amendments of 1970, 42 U.S.C. § 1857h–7 (1970). This section of the amendments provides that the Administrator of the Environmental Protection Agency shall review newly authorized federal construction projects. Plaintiffs allege that defendants neither sought nor received from the Administrator the review and comments required by section 309 with respect to construction of the Trident support facility at Bangor.

This contention is wholly without merit. The Environmental Protection Agency reviewed the draft EIS for the Trident support site and forwarded its comments to the Officer in charge of construction (OICC) of Trident on May 21, 1974. At that time EPA had environmental reservations and indicated that the draft statement lacked certain information necessary to properly determine the environmental impacts. EPA then reviewed the final EIS for the support site and found that it incorporated answers to most of their comments. In fact, the changes were considered by EPA to be a very substantial response to their initial comments and EPA dismissed its reservations on August 16, 1974, and stated that it had no objection to the proposed plan. Therefore this Court concludes as a matter of law that the Defendants complied with Section 309 of the Clean Air Act Amendments of 1970.

### ORDER

It is this 22nd day of August, 1975 ordered that the complaint be and hereby is dismissed.